# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AIRPORT INDUSTRIAL PARK, INC.<br>d/b/a P.E.C. CONTRACTING ENGINEERS<br><br>Plaintiff,<br><br>v.<br><br><br>THE UNITED STATES<br><br>Defendant. | ) | No. 02-1077C<br>(Judge Hewitt) |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court grant summary judgment in favor of the United States because there are no genuine issues of material fact and we are entitled to summary judgment as a matter of law. In support of this motion, we rely upon the pleadings, the declaration of Michael S. DeStefano, the following brief, and defendant's proposed findings of uncontroverted facts filed in conjunction with this brief pursuant to RCFC 56(h)(1).[1]

## DEFENDANT'S BRIEF

## ISSUE PRESENTED

Whether defendant is entitled to summary judgment where it terminated plaintiff's contract for default based upon plaintiff's undisputed failure to furnish a payment bond.

## STATEMENT OF THE CASE

[1] In this brief, "DPFUF" refers to defendant's proposed findings of uncontroverted facts. "DeStefano Decl." refers to the declaration of Michael S. DeStefano.

## I. Nature Of The Case

Plaintiff Airport Industrial Park, Inc. d/b/a P.E.C. Contracting Engineers ("P.E.C.") asserts that the defendant, acting through the Department of the Army, Pittsburgh District, Corps of Engineers (the "Corps"), wrongfully terminated a contract relating to certain waterfront construction work on Neville Island, Pennsylvania.[2] P.E.C. seeks monetary damages as a result of this allegedly wrongful termination.

## II. Statement Of Facts

The facts pertinent to this motion are set forth in our accompanying proposed findings of undisputed fact, which we respectfully incorporate by reference.

On March 25, 1999, the Corps awarded P.E.C. contract no. DACW59-99-C-0002, "New Dock Front, Pittsburgh Engineer Warehouse and Repair Shops, Neville Island, Pennsylvania" (the "contract"). DPFUF ¶ 1; DeStefano Decl. ¶ 2.

The solicitation for the contract indicated that "THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS" within ten calendar days of the award of the contract. In addition, the contract incorporated FAR § 52.228-1, 48 C.F.R. § 52.228-1 (1996), "Bid Guaranty," which requires successful bidders to furnish adequate bonds within ten days or face termination for default;[3] FAR § 52.228-2, 48 C.F.R. § 52.228-2 (1997),

---

[2] On February 13, 2003, P.E.C. voluntarily moved, and the Court granted P.E.C.'s motion, for dismissal without prejudice of P.E.C.'s claims based upon paragraphs 9 and 10 of the complaint (asserting that the Government delayed completion of the project). The Court further ordered P.E.C. to show cause why the Court should not also dismiss P.E.C.'s claims based on paragraph 8 of the complaint. The Court has not yet issued a decision with respect to this issue.

[3] For the convenience of the Court, excerpts of the relevant provisions of the FAR incorporated into the contract are set forth in the appendix to this motion.

"Additional Bond Security," which requires contractors to furnish additional security in the event that a surety becomes unacceptable to the Government; and FAR § 52.228-15, 48 C.F.R. § 52. 228-15 (1996), "Performance and Payment Bonds – Construction," which requires contractors to furnish performance and payment bonds in amounts dependent upon the contract price (in this case, a performance bond securing 100% of the contract price and a payment bond securing 40% of the contract price). DPFUF ¶¶ 2-3; DeStefano Decl. Ex. A.

On March 25, 1999, upon the award of the contract, P.E.C. obtained a performance bond and a payment bond from Amwest Surety Insurance Company ("Amwest") in the amounts of $4,646,931.00 and $1,858,772.40, respectively. These bonds were reviewed and approved by the Corps's counsel on April 14, 1999. DPFUF ¶ 4; DeStefano Decl. ¶ 4 & Exs. B, C.

Amwest obtained reinsurance from Swiss Reinsurance America Corporation ("Swiss Re") with respect to $2,646,831.00 of the performance bond. As stated in the reinsurance agreement (GSA Standard Form 273, "Reinsurance Agreement For A Miller Act Performance Bond"), the purpose of the reinsurance agreement was to "guarantee and indemnify the United States against loss under the performance bond to the extent of the 'Amount of Reinsurance,'" i.e., $2,646,831.00. The reinsurance agreement was reviewed and approved by the Corps's counsel on April 14, 1999. Significantly, Amwest never provided the Corps with a GSA Form 274, "Reinsurance Agreement for a Miller Act Payment Bond," and the Corps never reviewed or approved such an agreement. DPFUP ¶¶ 5-6; DeStefano Decl.¶ 5 & Ex. D.

In June 2001, before the completion of the work called for by the contract, Amwest was declared insolvent and the payment and performance bonds were cancelled. Accordingly, by letter dated July 6, 2001, Michael S. DeStefano, the contracting officer, directed P.E.C. to secure

acceptable replacement bonding within ten days. DPFUF ¶ 7; DeStefano Decl. ¶¶ 6, 7 & Exs. E-F.

P.E.C. never secured new bonding to replace the Amwest bonds. Rather, by letter dated July 20, 2001, counsel for P.E.C. advised the Corps of its belief that the reinsurance agreement between Amwest and Swiss Re applied to both the performance bond and the payment bond, and that no additional or replacement bonding was necessary. P.E.C. did not assert in this letter or in any other communication to the Corps prior to the commencement of this lawsuit that it was having difficulty obtaining a replacement payment bond, or that any conduct by the Corps had somehow prevented P.E.C. from obtaining replacement bonding. DPFUF ¶ 8; DeStefano Decl. ¶¶ 8, 9, 11 & Ex. G.

By letter dated July 31, 2001, the Corps notified P.E.C. that the contract would be terminated for default unless P.E.C. cured certain conditions, including its failure to secure a replacement payment bond. P.E.C. did not cure its failure to obtain a replacement payment bond (or the other conditions of default) and did not respond to Mr. DeStefano's letter. Accordingly, by letter dated August 17, 2001, the Corps sent notice to P.E.C. that the contract had been terminated for default as a result of its failure to cure. DPFUF ¶ 9-11; DeStefano Decl. ¶¶ 10-11 & Exs. H, I. This lawsuit followed.

## ARGUMENT

### I. Standard Of Review

Summary judgment must be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RCFC 56(c); Celotex v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986);

Golden Pacific Bancorp v. United States, 15 F.3d 1066, 1070 (Fed. Cir. 1994), cert. denied, 513 U.S. 961 (1994). A "material fact" is one "that might affect the outcome of the suit under the governing law," and "summary judgment will not lie if the dispute about a material fact is 'genuine . . .'" Anderson, 477 U.S. at 248. A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. Anderson, 477 U.S. at 248; Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987).

As the moving party, defendant may discharge its burden by demonstrating an absence of evidence as to an essential element of plaintiff's cause of action. Celotex, 477 U.S. at 322-325. If defendant makes this threshold showing, the burden shifts to the plaintiff to adduce evidence sufficient to create a genuine issue of material fact. Failure to make this evidentiary showing is fatal to plaintiff's claim and will entitle the movant to judgment as a matter of law. Dairyland Power Cooperative v. United States, 16 F.3d 1197, 1201 (Fed. Cir. 1994).

## II. The Government Is Entitled To Summary Judgment Because There Is No Dispute That P.E.C. Defaulted On Its Obligation To Secure A Payment Bond

There is no dispute that P.E.C. was required to secure (and maintain) both a performance bond and a payment bond as a precondition for the award of the contract. The solicitation stated in capital letters that the contractor was required to obtain performance and payment bonds, and the FAR provisions incorporated into the contract required the posting of such security (a performance bond securing 100% of the contract price and a payment bond securing 40% of the contract price) within ten days of the award or "promptly" upon the surety becoming unacceptable to the Government (such as through insolvency). See FAR §§ 52.228-1, 52.228-2, 52.228-15.

Nor is there any serious dispute that P.E.C. failed to secure adequate payment bond when the Amwest payment bond was cancelled and the Corps notified P.E.C. of this condition. Notwithstanding the arguments of P.E.C.'s counsel in 2001, the reinsurance agreement between Amwest and Swiss Re most decidedly did not apply to the payment bond issued by Amwest. On its face, the reinsurance agreement applied only to the performance bond, and it is undisputed that P.E.C. did not at the time of contracting provide the Corps with a reinsurance agreement (GSA Standard Form 274) that would have satisfied its obligation to secure a payment bond in the event its surety became insolvent. DPFUF ¶¶ 5-6; DeStefano Decl. ¶ 5 & Ex. D. P.E.C. has admitted as much in paragraph 8 its complaint, in which it concedes its "inability to obtain substitute bonding as a result of the failure of [its] bonding company during the course of the Project." P.E.C.'s professed "inability" to obtain substitute bonding belies the prior assertion of its counsel that the reinsurance agreement satisfied its payment bond obligation.[4]

Finally, P.E.C.'s failure to obtain necessary bonding justifies a termination for default. E.g., Postal Service Board of Contract Appeals: Quick-Deck, Inc., PSBCA No. 1451, 86-2 B.C.A. (CCH) ¶ 18,986 (Apr. 24, 1986) ("The failure to furnish bonds required by a contract is a failure of performance which will justify a termination for default."). Indeed, the solicitation made clear that the furnishing of adequate performance and payment bonds would be required

---

[4] P.E.C.'s argument, advanced in its Response to Order to Show Cause, that delays attributable to the Corps somehow prevented it from obtaining substitute bonding and therefore excuses its failure to do so, is also unavailing. As noted above, P.E.C.'s counsel (erroneously) represented prior to termination that the reinsurance agreement "clearly contemplates and covers both the performance bond and the payment bond." This contention belies P.E.C.'s current assertion that it attempted, but was unable, to obtain substitute bonding. Rather, it confirms that P.E.C. did not see the need for substitute bonding and could not possibly have been prevented from obtaining it.

within ten days of the award, and that the contractor's failure to obtain adequate bonding would justify a termination for default. FAR § 52.228-1(d). The failure to maintain such bonds is no less material a breach, see FAR § 52-228-2(a) (requiring contractor to furnish additional security in the event that the surety becomes unacceptable to the Government), and justifies the Corps's termination of the contract for default.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant defendant's motion for summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/

BRIAN M. SIMKIN
Assistant Director

/s/

ANDREW P. AVERBACH
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel. (202) 307-0290
Fax (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

WILLIAM A. LUBICK
Assistant District Counsel
U.S. Army Corps of Engineers,
Pittsburgh District
1813 Federal Building
1000 Liberty Avenue
Pittsburgh, PA 15222-1486
Tel. (412) 395-7495

September 11, 2003

# APPENDIX

## EXCERPTED PORTIONS OF RELEVANT FAR PROVISIONS INCORPORATED INTO CONTRACT NO. DACW59-99-C-0002

**52.228-1 Bid Guarantee (SEP 1996)**

. . . .

(d) If the successful bidder, upon acceptance of its bid by the Government within the period specified for acceptance, fails to execute all contractual documents or furnish executed bond(s) within 19 days after receipt of the forms by the bidder, the Contracting Officer may terminate the contract for default.

. . . .

**52.228-2 Additional Bond Security (OCT 1997)**

The Contractor shall promptly furnish additional security required to protect the Government and persons supplying labor and materials under this contract if –

(a) Any surety upon any bond, or issuing financial institution for other security, furnished with this contract becomes unacceptable to the Government.

. . . .

**52.228-15 Performance and Payment Bonds– Construction (SEP 1996)**

(a) Definitions. As used in this clause–

Contract price means the award price of the contract or, for requirements contracts, the price payable for the estimated quantity; or for indefinite-delivery type contracts, the price payable for the specified minimum quantity.

(b) Unless the resulting contract price is $100,000 or less, the successful offeror shall be required to furnish performance and payment bonds to the Contracting Officer as follows:

(1) Performance Bonds (Standard Form 25):

(i) The penal amount of performance shall be 100 percent of the original contract price.

(ii) The Government may require additional performance bond protection when the contract price is increased. The increase n protection shall generally equal 100 percent of the increase in contract price.

(iii) The government may secure additional protection by directing the Contractor to increase the penal amount of the existing bond or to obtain an additional bond.

(2) Payment Bonds (Standard Form 25-A)

(i) The penal amount of payment bonds shall equal–

(A) 50 percent of the contract price if the contract price if the contract price is not more than $1 million;

(B) 40 percent of the contract price if the contract price is more than $1 million but not more than $5 million; or

(C) $2.5 million if the contract price is more than $5 million.

(ii) If the original price is $5 million or less, the Government may require additional protection if the contract price is increased. The penal amount of the total protection shall meet the requirement of subparagraph (b)(2)(1) of this clause.

(iii) The government may secure additional protection by directing the Contractor to increase the penal amount of the existing bond or to obtain an additional bond.

(c) The Contractor shall furnish all executed bonds, including any necessary reinsurance agreements, to the Contracting Officer, within the time period specified in the Bid Guarantee provision of the solicitation, or otherwise specified by the Contacting Officer, but in any event before starting work.

. . . .