# In the United States Court of Federal Claims

No. 02-1077 C

(E-Filed: January 16, 2004)

| | |
|---|---|
| AIRPORT INDUSTRIAL PARK, INC. d/b/a/ P.E.C. CONTRACTING ENGINEERS, Plaintiff, v. THE UNITED STATES, Defendant. | Contracts; wrongful termination for default; Miller Act, 40 U.S.C.A. §§ 3131-3134 (West Supp. 2003); FAR §§ 52.228-1, -2, -15 (1998); summary judgment; default due to failure to maintain adequate payment bond; government delay as an excuse for default |

Stephen A. Hilger, Grand Rapids, MI, for plaintiff.

Andrew P. Averbach, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director and Brian M. Simkin, Assistant Director, Civil Division, United States Department of Justice, Washington, DC, for defendant. William A. Lubick, Assistant District Counsel, United States Army Corps of Engineers, Pittsburgh, PA, of counsel.

## OPINION

Plaintiff filed this suit on August 28, 2002 alleging that defendant United States wrongfully terminated plaintiff's contract for work in Pittsburgh, Pennsylvania. Complaint (Compl.) ¶¶ 5, 7, 11.[1] Defendant moved for summary judgment on September 11, 2003,

[1]Plaintiff voluntarily dismissed claims relating to "damages as a result of unforeseen site conditions, unavailability of owner-specified materials, compliance with the overall design intent, discrepancies in the design, the Contracting Officer's direction of unpaid changes, and owner delays regarding Plaintiff's mobilization." Compl. ¶ 9; see also Order of Feb. 13, 2003 at 2 (granting plaintiff's oral motion to dismiss all claims based on paragraph nine of the complaint). The only remaining claim is for wrongful termination of plaintiff's contract. Plaintiff's Response to Order to Show Cause at 2.

stating that plaintiff's "failure to obtain necessary bonding justifie[d] a termination for default." Defendant's Motion for Summary Judgment (defendant's motion or MSJ) at 6. Defendant's motion has been fully briefed by both parties. For the reasons discussed below, the court GRANTS defendant's motion.

## I. Background

The United States Army Corps of Engineers (the Corps) solicited bids on December 1, 1998 for construction and other work in Pittsburgh, Pennsylvania. Affidavit of Paul Chambers in Opposition to Motion for Summary Judgment (Chambers Aff.) ¶ 3; Compl. ¶ 2.[2] Contract Number DACW59-99-C-0002 "New Dock Front, Pittsburgh Engineer Warehouse and Repair Shops, Neville Island, Pennsylvania" (the contract) was awarded to Airport Industrial Park, Inc., d/b/a P.E.C. Contracting Engineers (plaintiff) on March 25, 1999. Declaration of Michael S. DeStefano in Support of Defendant's Motion for Summary Judgment (DeStefano Decl.) ¶ 2, Ex. A. The contract stated that "[t]he Contractor shall begin performance within 10 calendar days and complete it within 365 calendar days after receiving notice to proceed."[3] DeStefano Decl. Ex. A. The original amount of the contract was $4,646,931. Id.

The contract referenced regulations related to bonding required of the contract awardee.[4] MSJ at 2-3 (citing Fed. Acquisition Reg. (FAR) §§ 52.228-1, -2, -15 at 48 C.F.R. §§ 52.228-1, -2, -15 (1998)). On March 25, 1999, plaintiff obtained a performance bond with a penal sum of $4,646,931.00 and a payment bond with a penal sum of $1,858,772.40, both from Amwest Surety Insurance Company (Amwest).[5] DeStefano Decl. Exs. B, C. These bonds were approved by the Corps on April 14, 1999. MSJ at 3. Plaintiff also obtained on March 25, 1999 a reinsurance agreement for the performance bond in the amount of $2,646,831.00 provided by Swiss Reinsurance America Corporation (Swiss Re). Chambers Aff. ¶ 9. The reinsurance agreement was accepted by the Corps on April 14, 1999. DeStefano Decl. ¶ 5.

---

[2]Facts cited to the filings of only one party without an explanatory footnote appear to be undisputed.

[3]Plaintiff asserts that the original completion date would have been "365 days from the beginning of the contract . . . March 24, 2000." Chambers Aff. ¶ 10. The actual date of the notice to proceed is not before the court.

[4]The specific bonding requirements are discussed below in Part II.B.

[5]Plaintiff urges the court to view these two bonds as a single bond. This issue is discussed below in Part II.B.

The original completion date was extended several times by contract modifications signed by plaintiff and the Corps. Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, with Appendix (Def.'s Reply), Reply Declaration of Michael S. DeStefano (DeStefano Reply Decl.) ¶ 6. Modification P00004/Change "AE" extended the contract completion date until August 15, 2001. Id. Amwest became insolvent on June 7, 2001 and notified the Corps that its bonding of plaintiff for the contract was cancelled. DeStefano Decl. ¶ 5, Ex. E. The work on the contract was not complete. See Chambers Aff. ¶ 10 ("The work was approximately 50% complete . . . on August 17, 2001."). The Corps notified plaintiff that plaintiff no longer had valid bonds for the contract and directed plaintiff to deliver "acceptable performance and payment bonds" to the Corps within ten days or a stop work order would issue. DeStefano Decl. Ex. F.

Plaintiff's counsel responded on July 20, 2001 by letter to the Corps stating that plaintiff's reinsurance agreement "clearly contemplates and covers both the performance bond and the payment bond." DeStefano Decl. Ex. G. The Corps replied with a cure notice on July 31, 2001 stating that, among other conditions, "we have not received an acceptable Payment Bond in accordance with contract clause FAR 52.228-15." DeStefano Decl. Ex. H. The cure notice stated that if the conditions were not cured "within 10 days after receipt of this notice, the Government may terminate for default under the terms and conditions of contract clause FAR 52.249-10, Default (Fixed-Price Construction)." Id. Plaintiff did not respond to the cure notice and did not obtain and provide a replacement payment bond. See DeStefano Decl. Ex. I (terminating plaintiff's contract for these reasons, among others); Chambers Aff. ¶ 12 (mentioning various factors that "prevented P.E.C. Contracting Engineers from securing alternative payment bonds from new sources after Amwest Surety Insurance Company went insolvent"). The Corps terminated plaintiff's contract for default on August 17, 2001. DeStefano Decl. ¶ 11, Ex. I.

The government has had to defend against claims from subcontractors of plaintiff who seek payment for what they allege is unpaid work performed under the contract. Def.'s Reply at 2 n.2. The contract work was finished by Swiss Re, but there has been no showing that the government filed claims against the reinsurance of the performance bond for any excess costs created by the need to complete plaintiff's work. Response to Defendant's Motion for Summary Judgment (Pl.'s Resp.) at 2.

## II. Discussion

### A. Standard of Review

"Summary judgment shall be rendered if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Coast Fed. Bank,

FSB v. United States, 323 F.3d 1035, 1037 (Fed. Cir. 2003); see also Rules of the United States Court of Federal Claims 56(c) (setting out the standard for summary judgment). Material facts are those "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." Id.

"Where a movant has supported its motion with affidavits or other evidence which, unopposed, would establish its right to judgment, the non-movant may not rest upon general denials in its pleadings or otherwise, but must proffer countering evidence sufficient to create a genuine factual dispute." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987). "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994).

B. Analysis

As many decisions of boards of contract appeals have held, failure to furnish adequate bonding required by a government procurement contract is a material breach that justifies termination for default. See, e.g., Dieleman Constr. Co., ENG BCA No. 6213, 96-2 B.C.A. (CCH) ¶ 28,430, 1996 Eng. BCA LEXIS 12, at *22-23 (June 24, 1996) (finding that failure to provide performance and payment bonds was the "proper legal basis" for terminating appellant's contract for default); Pac. Sunset Builders, Inc., ASBCA No. 39,312, 93-3 B.C.A. (CCH) ¶ 25,923, 1993 ASBCA LEXIS 90, at *7-8 (Mar. 17, 1993) (stating that when sureties became unacceptable to government, appellant's failure to provide adequate financial information justified termination of contract for default); JaMar Constr. Co., ENG BCA No. 5251, 87-3 B.C.A. (CCH) ¶ 20,125, 1997 Eng. BCA LEXIS 57, at *9 (Aug. 21, 1987) (finding a "material breach entitling the Government to terminate the contract for default" when appellant's surety went bankrupt and appellant could not obtain substitute bonding); Quick-Deck, Inc., PSBCA No. 1451, 86-2 B.C.A. (CCH) ¶ 18,986, 1986 PSBCA LEXIS 89, at *3-5 (Apr. 24, 1986) (finding that the contract requirement for a payment bond, although not required by statute, was sufficient justification for termination for default when appellant did not provide the bond); Austin Elcon Corp., ASBCA No. 26,215, 82-1 B.C.A. (CCH) ¶ 15,718, 1982 ASBCA LEXIS 271, at *32 (Mar. 15, 1982) (approving the termination of the contract for default where appellant "failed to show that its failure to furnish the required performance and payment bonds was beyond its control and without its fault or negligence"); AJN Reporters, GSBCA No. 5022, 78-2 B.C.A. (CCH) ¶ 13,298, 1978 GSBCA LEXIS 58, at *2-4 (June 22, 1978) (finding proper the termination for default of a contract when no performance bond had been provided); cf. Aetna Cas. & Sur. Co. v. United States, 208 Ct. Cl. 515, 519 (1975) (observing that "by failing to furnish the [Miller

Act performance and payment] bonds within the required period of time, [the contractor] breached an existing and enforceable contract"). But see Cole's Constr. Co., ENG BCA No. 6074, 94-3 B.C.A. (CCH) ¶ 26,995, 1994 Eng. BCA LEXIS 15, at *27, 30-31 (June 20, 1994) (finding that the government failed to prove termination of the contract was proper where appellant delayed four weeks in obtaining bonds, the contract did not include a "Bid Guarantee" [equivalent to FAR § 52.228-1] clause and there was no evidence the delay in submission of the bonds would affect the performance schedule); Dry Roof Corp., VABCA No. 1804, 86-3 B.C.A. (CCH) ¶ 19,124, 1986 VA BCA LEXIS 75, at *21-24 (June 26, 1986) (finding that no default occurred where contracting officer miscalculated bond amount needed, requested irrelevant financial statements and acted inconsistently in determining the inadequacy of bonding provided).

Plaintiff acknowledges that after Amwest became insolvent plaintiff "could not provide a replacement payment bond for the Amwest bond." Pl.'s Resp. at 6. Plaintiff argues, however, that "it had reinsurance," id., and that "[t]he Government should be estopped from making any claim that the Reinsurance Agreement by Swiss Reinsurance America Corporation did not provide appropriate payment bond guarantees," id. at 5.

Plaintiff's reinsurance argument proceeds in four steps. The first step of plaintiff's argument is that both the Amwest performance bond and the Amwest payment bond are marked with a single bond number, "1382830," and that thus there was only one bond, "a performance-payment bond." Chambers Aff. ¶ 7. The second step in plaintiff's argument is that "[h]ad Amwest not been required to use the Government's forms, bond number 13828[3]0 would have been printed on a single form called a 'Performance and Payment Bond,' and there would have been no debate that the reinsurance agreement covered both aspects of the bond." Pl.'s Resp. at 5. The third step in plaintiff's argument is that "[i]f the Government wanted to take the position that it needed a separate Reinsurance Agreement for the payment bond, the time to make that argument would have been at the time the Reinsurance agreement was issued and . . . accepted by the [government]." Id. The fourth and final step in plaintiff's argument is that the Government is now estopped from arguing that insufficient payment bonding was provided because this would be "totally untimely," "certainly unfair" and "taking unfair advantage of an undisclosed technicality, particularly when no bond claim has been demonstrated." Id. at 5-6. Plaintiff cites no legal authority for its reinsurance argument. The court will discuss each step in plaintiff's argument in turn.

The Miller Act, 40 U.S.C.A. §§ 3131-3134 (West Supp. 2003), applies to the contract and requires that contractors "furnish to the United States two bonds: a payment bond and a performance bond, see 8 John Cosgrove McBride & Thomas J. Touhey, Government Contracts § 49A.20[1][a] (2003). "It should be carefully noted that a payment bond and a performance bond under the Miller Act are distinct and separate undertakings by the surety." Id. § 49A.60[2]. "Th[e] performance bond must designate the United States as

the obligee and it is for the exclusive protection of the government." Id. § 49A.70[1]. "The payment bond furnished under the Act is for the protection of laborers and materialmen, and not the United States." Id. § 49A.60[4]. The FAR section cited in the contract, FAR § 52.228-15, required a performance bond in the penal amount of $4,646,931.00 and a payment bond in the penal amount of $1,858,772.40. See FAR § 52.228-15(b)(1) (requiring the penal amount of a performance bond to be "100 percent of the original contract price"); id. § 52.228-15(b)(2)(B) (requiring the penal amount of a payment bond to be "40 percent of the contract price if the contract price is more than $1 million but not more than $5 million"). Bonds in these amounts were furnished by plaintiff on Standard Forms 25 and 25-A, DeStefano Decl. Exs. B, C, as required by FAR § 52.228-15(b)(1)-(2). Plaintiff's assertion that it furnished a single performance-payment bond to the Government, in lieu of the performance and payment bonds required by the contract, is unsupported by the documents provided to the court by both parties.

The second step in plaintiff's argument posits a hypothetical scenario that is not in accord with the undisputed facts of this case. In fact, plaintiff did submit a reinsurance agreement to the government which was accepted. DeStefano Decl. ¶ 5. This agreement provided reinsurance for the performance bond, not the payment bond. Id. Ex. D (stating under "Instructions" that "[t]his form is to be used in cases where it is desired to cover the excess of a Direct Writing Company's underwriting limitation by reinsurance instead of co-insurance on Miller Act performance bonds running to the United States"). A different form is used for reinsurance agreements for Miller Act payment bonds, and plaintiff did not furnish a reinsurance agreement for its payment bond to the Corps. See id. ¶ 5 (stating that plaintiff submitted GSA Standard Form 273 but not GSA Standard Form 274 "Reinsurance Agreement for a Miller Act Payment Bond"). There is no evidence that the reinsurance agreement titled "Reinsurance Agreement for a Miller Act Performance Bond" applied to the payment bond, because the terms of the agreement repeatedly mention obligations related to a performance bond, not a payment bond. See id. Ex. D.

The third step in plaintiff's argument concerns an alleged duty that the government had in March or April 1999 to inform plaintiff that its reinsurance agreement would not guarantee its payment bond obligation. Neither party alleges, however, that a reinsurance agreement for the payment bond was required at that time. Compare Plaintiff's Proposed Findings of Uncontroverted Fact (Pl.'s Facts) ¶ 6 ("[N]either the Defendant nor the Army Corps of Engineers ever sought an additional reinsurance form for a separate bond called a 'Payment Bond.'") with DeStefano Reply Decl. ¶ 3 ("P.E.C. had satisfied its payment bond obligation regardless of whether Amwest obtained reinsurance and, as a result, there was no reason for the Corps to demand additional reinsurance when the award was made or any time prior to Amwest's insolvency.").

Reinsurance may be required when a Miller Act payment bond is issued by a surety

and the penal sum of the bond is greater than that surety's underwriting limit. See FAR § 28.202(a)(1)-(2) at 48 C.F.R. § 28.202(a)(1)-(2) (1998) (stating, in a section titled "Acceptability of corporate sureties," that only sureties listed on Department of the Treasury Circular 570 are acceptable and that "[i]f the penal amount exceeds the underwriting limit, the bond will be acceptable only if (i) the amount which exceeds the specified limit is coinsured or reinsured and (ii) the amount of coinsurance or reinsurance does not exceed the underwriting limit of each coinsurer or reinsurer"). Amwest's underwriting limit per bond listed on the Department of the Treasury Circular 570 at the time of the issuance of the payment bond in this contract was $2,510,000. Fiscal Serv., Dep't of Treasury, Dep't Circular 570, Companies Holding Certificates of Authority as Acceptable Sureties on Federal Bonds and as Acceptable Reinsuring Companies, 63 Fed. Reg. 36,079, 36,080, 36,084 (July 1, 1998). Because plaintiff furnished the Amwest payment bond for $1,858,772.40, see DeStefano Decl. Ex. C, and because Amwest's underwriting limit exceeded that amount, there was no requirement for reinsurance for the payment bond at the time of contracting, see FAR § 28.202(a)(2). Because plaintiff was not required to provide reinsurance for its payment bond on the contract at the time of contracting, the Corps cannot be held to a duty as of March or April 1999 to notify plaintiff of unforeseeable future difficulties that might ensue from plaintiff's lack of reinsurance for the Amwest payment bond.

The fourth and final step in plaintiff's argument is that the Government insisted on "an undisclosed technicality" to terminate its contract for default. Pl.'s Resp. at 6. Plaintiff had notice of its obligation to obtain and maintain an adequate payment bond at the time of contracting. See DeStefano Decl. Ex. A (showing the pertinent FAR regulations incorporated into the contract: FAR §§ 52.228-1, 52.228-2, 52.228-15). The obligation to furnish a payment bond is not a mere technicality. See Austin Elcon Corp., 1982 ASBCA LEXIS 271, at *28 (stating that "the requirement for performance and payment bonds is substantial and cannot be brushed off as a merely 'technical requirement[] for additional proof of bond'"). The payment bond requirement is mandated by the Miller Act and protects subcontractors and materialmen. See Aetna Cas. & Sur. Co., 208 Ct. Cl. at 520 ("The Miller Act requirement that the contractor file a payment bond is intended to protect subcontractors and materialmen on the particular contract for which the bond is required."); JaMar Constr. Co., 1987 Eng. BCA LEXIS 57, at *9 ("We consider that Appellant's abandonment of its attempts [to get a new surety] and its unexcused failure to satisfy the terms of the "Additional Bond Security" clause constituted a material breach entitling the Government to terminate the contract for default."). In this contract, the payment bond became inadequate when the work was approximately 50% complete. Chambers Aff. ¶¶ 10, 11. The Government's request for a substitute payment bond under these circumstances was entirely reasonable and authorized by statute and by relevant precedent. Plaintiff's reinsurance argument does not in any way controvert the operative fact that plaintiff failed to maintain adequate payment bonding as required by its contract.

Next, plaintiff advances the defense that if there was a problem with its payment bond, plaintiff's failure to maintain adequate payment bonding was excused by government delay.[6] Pl.'s Resp. at 3, 5. According to plaintiff, government delay caused the bonding problem in two different respects. Id. First, absent government delay, plaintiff asserts that the project would have been completed before Amwest became insolvent. Id. at 3. Second, absent government delay, plaintiff asserts that plaintiff's bonding capacity would not have been "tied up for almost 2½ years" and plaintiff would not have "experienced considerable difficulty in trying to obtain a substitute Payment Bond once the request was made by the Government." Pl.'s Facts ¶ 12(3). Plaintiff cites no legal authority for its government delay defense.

As a threshold matter, the court notes that plaintiff has abandoned any monetary claims based on the government's contract performance. See supra note 1. Indeed, jurisdiction in this court will not normally lie for such a claim unless the claim was previously presented to the contract officer. See Mark Smith Constr. Co. v. United States, 10 Cl. Ct. 540, 546 (1986) ("A basic prerequisite to direct access jurisdiction in this court is that the contractor-plaintiff first must present its claim, in writing, to its duly designated contracting officer." (citing 41 U.S.C. §§ 605(a), 609 (2000))). The contract apparently included mechanisms for deciding government delay claims, because plaintiff participated in several contract modifications which included price adjustments and extensions of contract completion time because of "differing site conditions" and "suspension of work." See DeStefano Reply Decl. Exs. A, B, C, D. Mr. DeStefano, the contract officer, states that none of plaintiff's delay claims advanced in this court was made to him at the time of contract performance. DeStefano Reply Decl. ¶ 4 ("[N]one of these issues was ever raised before me as contracting officer and many are to[o] vague even to respond to."). Nor has plaintiff alleged evidence that its government delay claims were previously submitted to the contract officer. Plaintiff supports these government delay allegations with one paragraph of descriptive, general commentary by Paul Chambers, its corporate president. See Chambers Aff. ¶ 10.

When contesting termination for default, once the government has proved default, plaintiff has the burden of proving that the default was excusable under the terms of the contract. See Phillips Constr. Co., IBCA Nos. 1295-8-79 & 1296-8-79, 81-2 B.C.A. (CCH) ¶ 15,256, 1981 IBCA LEXIS 29, at *7 (July 31, 1981) ("Generally, the Government

---

[6]Plaintiff's government delay defense contains diverse assertions of fact concerning the government's contract performance that allegedly caused delays and increased costs to plaintiff. See Chambers Aff. ¶ 10 ("This [various problems allegedly caused by the government] took considerable extra time and money."). For simplicity, these assertions are summarized as plaintiff's government delay defense in this opinion.

must prove the contractor's default, while the contractor must undertake the task of showing that the failure to perform was excusable under the terms of the contract."). Because plaintiff has the burden of proving the excuse for its default, in opposing summary judgment plaintiff must allege facts that go to the existence of an excuse for its default. See Dairyland Power, 16 F.3d at 1202 ("A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial . . . entitles the moving party to summary judgment as a matter of law."). Here, to prevail against the government's motion for summary judgment, plaintiff has the burden of alleging facts that would prove that the government committed a material breach of the contract which would excuse plaintiff's default on the payment bond requirement. See Optimal Data Corp. v. United States, 17 Cl. Ct. 723, 730 (1989) (granting government's motion for summary judgment over plaintiff's allegation of government breach when "plaintiff has not specifically pointed to any provision in the contract that was allegedly breached by the delays in issue and has not presented evidence sufficient to demonstrate the existence of a material issue of fact as to the existence of any such breach").

Plaintiff has not met this burden. Plaintiff has pointed to no specific contract term that has been breached by the government. Plaintiff has not presented any theory of a breach of an implied obligation on the part of the government, or shown how such an obligation may or may not have been limited by explicit terms of the contract. See Cedar Lumber, Inc. v. United States, 5 Cl. Ct. 539, 549-53 (1984) (discussing the interplay between the "implied obligation on both parties to cooperate and not to hinder the performance of the other party" and express contract language). Because plaintiff has not alleged facts that would be essential to its government delay defense, there is no genuine issue of material fact concerning plaintiff's contention that its default in providing adequate payment bonding on the contract was excusable.

## III. Conclusion

For the foregoing reasons, the court finds that defendant's termination for default of the contract was justified due to plaintiff's default in providing an adequate payment bond. Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge